**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DOCK TIMMONS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Judge Blanche M. Manning** |
| | ) | |
| **v.** | ) | **Case No. 04 C 3045** |
| | ) | |
| **GENERAL MOTORS CORP.** | ) | |
| **NORTH AMERICA** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM AND ORDER**

Before the court is defendant's motion for summary judgment as to plaintiff's claim of

disability discrimination under the Americans with Disabilities Act, 42 U.S.C § 12112(a), et seq.

("ADA").[1]  For the reasons stated below, defendant's motion is granted.

**I.     FACTS**

Timmons' Position at GM

Plaintiff Dick Timmons ("Timmons") began his employment at General Motors, North

America ("GM") in 1974.  In October 1992, Timmons was diagnosed with multiple sclerosis

("MS") and informed GM of the diagnosis sometime in 1992.  Timmons' MS affects his ability

to walk.

In 1999, Timmons became a Customer Activities Manager ("CAM") for GM.  At the

time plaintiff assumed this position, he was a seventh-level employee for GM.  CAMs are

---

[1]Plaintiff voluntarily dismissed with prejudice the remaining claims of his complaint,
including count II (age discrimination), count III (race discrimination), and count IV (racial
discrimination), on March 1, 2005.

required to handle a variety of customer relations issues both in person and on the phone at various GM dealerships in the region and at GM's three customer call centers in Florida, Texas, and California. CAMs also attend dealer meetings in Illinois and other states, represent GM at arbitrations and court hearings, handle buy-back cases, and ensure that GM's field employees understand how to respond to customer issues relating to the Better Business Bureau.

The written job description for CAMs states that a willingness to travel and a valid driver's license are required for the position. Timmons was required to turn in a copy of his driver's license every six months to assure its continued validity. At the relevant time, Timmons had a valid driver's license. The necessity for Timmons to travel and drive a company car arose in a variety of situations, such as when Timmons attended monthly service managers club meetings at various locations including Bloomington, Peoria, and Naperville, Illinois, and Wisconsin. Plaintiff also was required to drive to attend service meetings which were held at various locations including Columbus and Cleveland, Ohio, and Detroit, Michigan. Finally, plaintiff traveled to GM's call center in Florida, Texas and California.

Thomas Tyler, a regional service manager who supervised plaintiff from January 1, 1999 to January 31, 2003, estimated that Timmons' position required him to travel to various hearings and meetings approximately fifty percent of the time. In his deposition, Timmons was asked, "Could you imagine being able to perform [your] job if you weren't able to drive?" Timmons responded, "No." In either 1999 or 2000, Timmons was promoted to an eighth-level employee. As an eighth-level employee, Timmons was required to purchase a GM car to evaluate the car for product flaws.

GM's Concerns with Timmons' Driving

In 2002, Tyler testified that he began receiving reports from area service managers and field personnel that Timmons was driving slowly on the highways and holding up traffic. Tyler testified that he could not specifically name the individuals who made these reports. Tyler also testified that he spoke to Timmons[2] and Joyce Saunders, GM's regional human resources manager, about Timmons' ability to drive a company vehicle because he was concerned (1) for Timmon's safety, (2) as to whether Timmons could safely drive a company car and (3) about GM's liability when Timmons drove a company vehicle. Tyler testified that he had these discussions in the latter half of 2002 "because that's when, in my opinion, things were deteriorating."

In summer 2002, Saunders contacted her supervisor, Wendy Soubel, and Dr. Johnson and Dr. Sue Ting, two medical doctors employed by GM, to discuss her concerns about Timmons' ability to drive safely in light of the fact plaintiff was falling asleep at work and in meetings and was driving "rather slowly" in the streets near the office. Saunders stated in her deposition that she never saw Timmons driving. Timmons testified that his medications caused the sleepiness and that when his doctor adjusted the timing of when he took the medication, he told Saunders that the problem was resolved.

Consistent with GM's policies and standard practices, Dr. Ting contacted Timmons' treating physicians, Dr. Edward Yang and Dr. Helge Frank, to discuss GM's concerns and to determine whether plaintiff could drive safely. Dr. Yang and Dr. Frank told Dr. Ting that Timmons was safe to drive. According to Dr. Ting, Dr. Yang stated that he had looked at Timmons' medication and "may have adjusted something" and was more assured that he would

_____

[2]Timmons testified that no one at GM spoke with him about his driving.

3

be more alert when driving. The record indicates that these conversations took place sometime in 2002.[3] While plaintiff was not required to undergo a driving evaluation, it was one of the options considered by Dr. Ting, Tyler and Saunders.

In February 2003, Jim Swinson became regional services manager and plaintiff's supervisor. Swinson had been aware of Timmons' MS since 1999. Swinson testified that on February 11, 2003, plaintiff lost control of his scooter, hit a hole and fell out, damaging the scooter.[4] Swinson stated that he filled out an incident report about the accident and gave it to his personnel director. This incident caused him to become concerned that Timmons was not able to control a vehicle. Timmons testified that he fell out of the scooter because he hit a pothole in the parking lot. Swinson also testified that he was concerned about plaintiff's ability to drive safely because he saw Timmons "wandering" when he drove on the expressway and driving on the expressway below 45 miles an hour, which Swinson considered unsafe. In addition, Swinson testified that Timmons' assistant, Sandra Kinney, drove him to a meeting in Dubuque, Iowa because Timmons was not comfortable driving. Timmons disputes that he ever asked Kinney to drive him anywhere and that she usually drove when they were traveling to meetings together.

Saunders also stated that she was concerned about Timmons' ability to drive safely without harming himself or others and about GM's liability with respect to Timmons' operating a company-owned car. As a result, GM decided to get their "medical people" involved to directly

---

[3]The court notes that while some deposition excerpts referenced in the plaintiff's statement of facts refer to exhibits, most of these exhibits have not been included in the plaintiff's submissions.

[4]Because Timmons' MS caused him to have trouble walking, Timmons began using a motorized scooter that had been purchased by GM.

evaluate his ability to drive from a medical standpoint. Swinson testified that he told Timmons on May 6, 2003 that he had a "personal concern" with Timmons' ability to drive safely and stated that he told Timmons that GM was going to have him evaluated by a professional to determine whether he could drive safely. Timmons contends that no one ever discussed his ability to drive with him and that GM asked if it could obtain his medical records and speak to his doctor.

On May 8, 2003, Timmons stated that he wanted GM's doctors to talk to his treating physician, Dr. Frank, about his ability to drive. Swinson told Timmons that he would need Timmons to sign a medical release, which plaintiff did voluntarily. On June 2, 2003, Timmons wrote Dr. Frank and requested that he send Timmons' medical records to Dr. Gerrick, a GM-employed doctor. On June 10, 2003, Timmons rescinded his medical records authorization and canceled his request for Dr. Frank to send his medical records to Dr. Frank. Plaintiff stated that he rescinded the authorization because his wife believed GM was "trying to get a reason why that [sic] they can get rid of [him]." In letters that Timmons states he sent to Dr. Frank regarding GM speaking with Dr. Frank, Timmons contends that he rescinded the authorization because GM had been "harassing" him and "pressuring" him to retire.[5]

Dr. Lacey's Examination of Timmons

On June 18, 2003, Timmons underwent a medical evaluation by Dr. Roy Lacey, D.O., GM's divisional medical director for GM's EMD facility in LaGrange, Illinois. Swinson drove

---

[5]GM objects to these letters on the ground that they are inadmissible hearsay without providing a specific basis for the hearsay objection. It is not clear to this court how the letters, which Timmons testified he sent, constitute hearsay. Because the court does not consider the content of the letters to be material for purposes of summary judgment, it is not necessary to resolve this objection. The court notes, however, that simply because documents may include statements or information that do not reflect well on that party does not provide a basis for excluding them.

Timmons to the evaluation and allowed Timmons' wife to attend. Timmons testified that he was

given less than a day's notice of the examination and did not feel he had the power to refuse to

attend.[6] Dr. Lacey is a board certified occupational environmental medicine specialist and has

been employed by GM since 1981. As divisional medical director, Dr. Lacey is responsible for

administering all health, safety and medical issues as they relate to employees' health and safety

in the work environment. These issues include acute and chronic illnesses, return to work

evaluations, pre-employment and pre-placement evaluations, fitness for duty, job site analysis,

and working with GM's worker's compensation department to assist employees with job-related

injuries in finding positions they can perform with their medical restrictions. Dr. Lacey is not a

neurologist. He has evaluated other individuals' fitness to drive.

Swinson spoke with Dr. Lacey prior to the evaluation and told him the physical

requirements of the CAM position included driving and interacting with customers and

employees in person and on the telephone. Dr. Lacey testified that the purpose of his evaluation

was to determine Timmons' general fitness for duty based on Timmons' job description. After

examining Timmons, Dr. Lacey determined that Timmons:(1) had optic atrophy in both eyes,

which can cause visual impairment; (2) had an ataxic gait when walking; (3) wore a brace on his

left leg; (4) had a left arm that did not move as a result of a neurological impairment; (5) needed

assistance sitting on the examination table; (6) had a left hand that was severely contracted to the

point that he could not grasp with or completely close it; (7) had muscle twitching; (8) had a right

lateral thigh that was painful to palpitation; (9) had a dropped foot as a result of severe nerve root

---

[6]Swinson, who notified Timmons of the exam, answered "that's the way I remember it, yes" when asked if Timmons expressed a willingness to attend the examination.

impairment; and (10) had poor insight and impaired reasoning because he believed he could perform any and all aspects of his job, including driving, despite his medical limitations and the fact that his ability to turn his neck was limited to 40 degrees on the right side and 35 degrees on the left side, which is less than the 60 degree normal range.

Dr. Lacey determined that Timmons could not safely operate a GM vehicle with his medical restrictions because Timmons' optic atrophy could potentially interfere with his ability to drive, the contractions of his left upper extremity impaired his ability to safely grip and grasp the steering wheel, his dropped foot was significantly impaired to the extent that Timmons could not adequately respond if the need arose in terms of braking or using the gas pedal, and Timmons could not turn his neck as required to view hazards, see if someone was behind him, or change lanes. Dr. Lacey believed, however, that Timmons could perform a position that did not require him to drive or stand or walk more than 30 minutes at a time.

Dr. Frank, Timmons' neurologist, opined in a sworn statement given in September 2004 that Timmons was not restricted in working despite his MS. In that statement, he stated that Timmons was capable of driving as long as the car was fitted with the appropriate devices to drive. In his December 2004 deposition, Dr. Frank testified that up until his December 2003 examination of Timmons, he had no concern about Timmons' ability to drive provided the car was modified with hand controls. The hand control restriction would have been in place for several years prior to 2003.[7] Further, in 2002, Dr. Yang, another of plaintiff's treating

---

[7]While the parties discuss (and at times dispute) the specific medical findings by Dr. Frank, the court does not consider these specifics material to resolution of this motion. Both parties agree that Dr. Frank believed that Timmons was capable of driving at least with hand control modifications. Accordingly, the detailed medical findings will not be described here.

physicians, indicated to Dr. Ting at GM that Timmons had the ability to drive safely. Joyce Saunders also testified that Dr. Ting and Dr. Gerrick, another GM physician, told her in 2002 that it was safe for Timmons to drive based on the information received from Dr. Frank. Timmons drove to work everyday until the company car was taken away on June 18, 2003. Timmons parked a block and a half away from the office and walked the distance to his office until he got his scooter in or around June 2002. At that time, he used the scooter to travel from where he parked his car to the office.

Timmons testified that he had never received any driving tickets, that he never had any accidents and there were no restrictions on his license. GM considered performing a driving test on Timmons in 2002 but a test was never performed.

On June 18, 2003, after Dr. Lacey's examination, GM placed Timmons on paid disability leave based on its findings that driving was an essential job function of Timmons' position, Timmons could not drive safely and there were no other positions available that did not require Timmons to travel. Timmons did not propose any accommodation to GM which would have allowed him to perform the essential functions of his position or any other position at GM. Furthermore, while Timmons believes there were "many other jobs" he could have performed at GM, he admits he did not ask for any other job and does not know if any such positions were open at the time he was placed on medical leave.

GM's Past Accommodations of Timmons

Timmons had asked his previous supervisor, Tyler, to modify the monitor and keyboard on his computer workstation to prevent his MS from progressing and Tyler complied. GM also provided Timmons with a motorized scooter, which was paid for through GM's insurance

program. In addition, GM had a lift installed in Timmons' car so that he could get the scooter out of the car without difficulty. GM paid for Timmons to rent scooters when he traveled by plane. At Timmons' request, GM installed an automatic door opener on the front door of its office building. GM also remodeled its restroom facilities and installed an automatic door opener on the restroom doors. Although Timmons had not requested the automatic door opener on the restroom doors, he was "very appreciative of it." In 2002, GM equipped Timmons' home with an office, including a computer, desk, chair, fax machine and printer to allow Timmons to work at home on the days his medication or the weather made it difficult for him to come to the office. GM paid Timmons' phone and fax bills. Timmons testified that GM told him to discard the chair and desk from his home office because it did not want them back and so he kept them. Timmons also testified that he kept the lift and the scooter because the latter was paid for through insurance. Timmons stated that he offered to give the lift back but GM did not want it.

In mid-2002, Tyler offered Timmons an assistant CAM position, which would have maintained Timmons' employment level and salary, but would not have required Timmons to travel. Timmons rejected the position. Timmons denies that he would have maintained his employment level and salary if he took the position, and states that the offer of such a position was in the nature of a demotion. Timmons offers nothing in support of these contentions other than his own testimony. GM also discussed with Timmons the possibility of creating a position for him in GM's Regional Consulting Center as a service manager in mid-2002 and again in 2003. GM states that Timmons would have retained his employment level and salary and would not have been required to travel. Timmons also rejected this position.

Based again on his own testimony, Timmons contends that although GM stated the

position was an eighth level, there was no guarantee that it would remain as such and that "he'd seen it [i.e., the alleged imminent demotion since he would be doing the same job of sixth and seventh levels who did not get cars] happen too many times before."[8] Timmons also stated that he didn't think it would "wash" that he could not have a car in his then current position but that he'd be given one in his new position. Further, Timmons testified that he considered the RCC position a demotion because he would report to two or three persons, rather than one, he would report to another eighth level employee, and he believed the position could affect his eighth level status in the future.

Discussions Regarding Timmons' Retirement

In April 2002, GM offered all eligible employees, including plaintiff, a window retirement program, which would have allowed Timmons to retire before the standard retirement age, yet still receive retirement benefits, including pension payments. Tyler discussed the program with Timmons, but Timmons declined. Timmons also testified that both Tyler and Swinson suggested that he also consider taking a disability retirement on several occasions. On March 10, 2003, Timmons discussed the issue of taking disability retirement with Swinson. Swinson approached Saunders and told her that plaintiff was interested in going on disability leave or taking a medical retirement. Swinson thought retirement was in Timmons' best interest

---

[8]Specifically, Timmons testified as follows: Q: So the way it was presented to you, you would have – you would have maintained your eighth level. But what you're saying is you thought in the future someone is going to complain about this? A: Yes. Q: Did anybody ever tell you that they didn't think the eighth level would be permanent? A: No. Q: That was something that you speculated on based on your employment with GM? A: Yes. (Timmons dep. at 122). Further, Timmons testified that although Swinson had left him a voicemail message saying that Timmons had Swinson's word that Timmons would always have a company car and would always be at the eighth level, Timmons did not believe him. (*Id.* at 123).

because of the difficulties he was having performing his job, including falling asleep at work, complaints about his performance, his failure to come to the office on a regular basis and the fact that Sandra Kinney, Timmons' assistant, was covering part of plaintiff's workload.

On April 14, 2003, Swinson and Saunders met with Timmons. Swinson conveyed to Timmons that if he wanted to take a disability retirement, he would first go on paid temporary disability leave, which would then be converted into paid permanent disability leave and then retirement. Saunders also gave Timmons estimates of what his disability retirement payments would be. Timmons decided to continue working and not take a disability retirement. Timmons cannot identify any accommodation he requested that GM did not provide. For the first six months of Timmons' disability leave, he received his full GM salary. After the initial six-month period, Timmons' payments from GM were reduced to reflect the sums Timmons began receiving from the Social Security Administration.

<u>Timmons' Job Performance</u>

Timmons' job reviews for the years 2000, 2001 and 2002 contained no criticism of Timmons' job performance. While Tyler testified that Timmons' medical condition began to affect his ability to travel in 2002,[9] Tyler could not state whether Timmons had ever asked that anybody travel with him and answered "no" when asked if he could recall any specific instances when Timmons said to Tyler that it was difficult for him to attend a meeting. Tyler also recalled generally that Timmons was not in the field on occasions when he was expected to be and had difficulty carrying his briefcase and getting to the office on some days. Further, Tyler testified

---

[9]Tyler also testified that while Timmons' medical condition did not adversely affect his performance in 1999, 2000 and 2001, Timmons did not meet one of his business plan objectives for 2002.

that Timmons fell asleep on several occasions while working and on one occasion fell asleep for two and a half hours and could not be woken up because of a medication problem. Timmons admits that he fell asleep on two occasions but states that once his doctor changed his medication, he never again fell asleep at meetings.

Tyler began receiving reports from area service managers that Timmons was not returning phone calls. While Timmons claims he was unaware of these complaints and that he always returned phone calls, Tyler testified that he talked to Timmons about returning phone calls and Timmons told Tyler he had returned calls when in fact he had not. Tyler stated that he did not document the complaints he received regarding Timmons' failure to return calls. Timmons testified he always returned phone calls. Tyler also testified that he spoke with Kinney who informed him that she was performing some of Timmons' job duties. Timmons denies this occurred.

Swinson did not recall Timmons' former supervisor, Tyler, expressing any concerns about Timmons' performance. However, on March 10, 2003, Swinson met with Timmons to review his 2003 goals and objectives. Swinson told Timmons that he did not believe Timmons was carrying his share of the workload, that Kinney was doing more than what her job responsibilities outlined, and that he was receiving complaints that Timmons was not returning phone calls. Swinson testified that he was concerned because Kinney was performing a fair amount of work that Timmons should have been doing, including returning the majority of phone calls from the call center. Further, Swinson stated that Timmons was not coming in as frequently as he should, he was falling asleep at work and at meetings, and service managers in the call centers were complaining about Timmons not returning their calls. Swinson, however, did not

document any complaints by other employees.

Swinson testified that Timmons' lack of involvement prevented the region from performing as well as it could. Timmons also missed a required zone manager meeting on March 19, 2003, which Timmons stated was due to a doctor's appointment. Swinson discussed his concerns with Saunders around the March 10, 2003 time frame. Swinson stated that during the March 10 meeting, Timmons raised the issue of taking a medical retirement because of his job performance, while Timmons denies this.

Swinson and Timmons had another meeting on April 14, 2003. Swinson testified that at this meeting Swinson reiterated that he did not believe Timmons was capable of completely fulfilling his job responsibilities and that Kinney was performing more responsibilities than she should. Timmons denies that Kinney was performing his job responsibilities and that she went to some meetings in Austin and Florida in his place because she had family in those places. Swinson again met with Timmons on May 6, 2003. Swinson testified that at that meeting, Timmons requested another six months to make a decision on retirement. Swinson told Timmons that he did not believe that "we could or should continue the way we are for the next six months." Swinson told Timmons that changes needed to be made to the way he performed his job responsibilities so that he performed at the required level. Swinson testified that his persoanl notes of a subsequent May 6, 2003, meeting he had with Timmons indicate that Timmons told him at that meeting that his doctor would not sign a disability certification.

As regional service manager, Tyler and Swinson supervised approximately twenty employees. Timmons was the only CAM under their supervision. During Timmons' tenure as a CAM, neither Swinson nor Tyler nor Saunders were concerned about the driving abilities of any

other employees.  As a result, they did not refer any other employee to a medical doctor to determine whether the employee could safely operate a company vehicle.  Timmons testified that at some unidentified point in time, Tyler asked him how long he would be able to keep working and if "they" had told Timmons when he would be in a wheelchair.  Timmons does not believe that Tyler was trying to offend him by the questions.

Timmons was promoted twice after he informed GM he had MS and the second promotion occurred while Tyler supervised Timmons.  While Swinson testified that Timmons was not terminated at the time he was put on disability leave, Swinson testified that he was not certain if Timmons remains employed with GM.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper when the "pleadings, deposition, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact."  Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party opposing the summary judgment motion may not rest upon the mere allegations or denials of the adverse party's pleading; rather, it must respond with "specific facts showing that there is a genuine issue for trial."  Fed.R.Civ.P. 56(e).  The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 322-23.  This court must evaluate the evidence supporting the summary judgment motion in a light most favorable to the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III.    ANALYSIS

"The ADA forbids certain employers from 'discriminat[ing] against a qualified individual

with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.'" *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 502-03 (7th Cir. 2004) (*citing* 42 U.S.C. § 12112(a) (2000)).  Timmons may proceed under either the direct or indirect method to prove that he suffered disability discrimination under the ADA.  *Id. (citing Robin v. Espo Engineering Corp.*, 200 F.3d 1081, 1089 (7th Cir. 2000)).

I.     Timmons Fails to Satisfy the Prima Facie Case

Timmons has chosen to proceed under the indirect method, which first requires him to establish a prima facie case of discrimination.  "He therefore must satisfy the four requirements for a prima facie case by submitting evidence at the summary judgment stage that, if believed, would show that: (1) he is disabled within the meaning of the ADA; (2) he was meeting his employer's legitimate employment expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees received more favorable treatment."  *Rooney v. Koch Air, LLC*, 410 F.3d 376, 380-81 (7th Cir. 2005) (*citing Amadio v. Ford Motor Co.*, 238 F.3d 919, 924 (7th Cir. 2001)).  If Timmons establishes the prima facie case, the burden then shifts to GM to put forth a nondiscriminatory reason for each adverse employment action.  *Id.*  If GM meets its burden, Timmons "would then have to prove by a preponderance of the evidence that [GM's] proffered reasons were a pretext for intentional discrimination." *Buie,* 366 F.3d at 503 *(citing Dvorak*, 289 F.3d at 485).

The court moves immediately to the fourth prong of the test, whether similarly situated employees received more favorable treatment, as it is outcome determinative.  As noted above, it

is plaintiff's burden to put forth evidence sufficient to state a prime facie case of disability discrimination. Timmons' brief, however, is noticeably lacking in any discussion of similarly situated employees. Timmons does not provide this court with any evidence of a similarly situated employee who was treated more favorably than he was treated. To establish that another employee is similarly situated, Timmons must show that there is someone who is directly comparable to him in all material respects. *See Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 680 (7th Cir. 2002). To determine whether employees are directly comparable, the court looks to relevant factors, including whether the employee: (1) held the same or similar job; (2) was subject to the same standards; (3) was supervised by the same person; and (4) had comparable experience, education, and other qualifications. *See Ajayi v. Aramark Bus. Serv., Inc.,* 336 F.3d 520, 532 (7th Cir. 2003). Timmons has not provided any information of evidentiary quality, *i.e.,* depositions, answers to interrogatories, admissions on file, or affidavits, that fulfill these criteria. *See Celotex Corp.,* 477 U.S. at 322. As such, Timmons has not established that one of his co-workers was similarly situated in the first instance, let alone that a similarly situated employee was treated more favorably than him.

Timmons' failure to discuss similarly situated employees is attributable to his use of a different test for the prima facie case. Specifically, plaintiff cites to *Lawson v. CSX Transp., Inc.,* 245 F.3d 916 (7th Cir. 2001), which states that the prima facie case is as follows: (1) that he is disabled within the meaning of the ADA, (2) that he was qualified for the position, (3) that he was subject to an adverse employment action, and (4) that the circumstances surrounding the adverse action indicate that it is more likely than not that his disability was the reason for it. (*citing Weigel v. Target Stores,* 122 F.3d 461, 465 (7th Cir. 1997); *see also Leffel v. Valley Fin.*

*Servs.*, 113 F.3d 787, 794 (7th Cir. 1997)).

While acknowledging that *Lawson* appears to be good law, the court is not convinced that this is the appropriate test in this circumstance. First, as noted above, the most recent Seventh Circuit pronouncement states that the indirect method of proving a disability discrimination claim involves a prima facie case that includes a showing that similarly situated employees were treated more favorably. *See Rooney*, 410 F.3d at 380-81. Second, the basis under which Timmons is proceeding (i.e., a disparate treatment claim) means that he believes that he has been treated differently than others not suffering from his alleged disability. By eliminating the requirement that he show that similarly situated employees were treated more favorably, it seems that the prima facie test has lost significant punch.

Finally, the fourth prong of the *Lawson* test seems out of place in this context – that the circumstances surrounding Timmons' being placed on involuntary disability leave indicate that it is more likely than not that his disability was the reason for it. The circularity of the statement is apparent. Given that GM put him on disability leave, the final prong really is nothing more than an attempt by Timmons to show that GM did not really have a basis for putting him on disability. In other words, that GM's reason for putting him on disability (i.e., because their internal doctor determined that Timmons could not drive safely and driving was an essential function of his job) was pretextual.[10]

Nevertheless, as detailed below, the court finds that even under the prima facie test as

---

[10]Indeed, this case would seem to be more apt as a possible failure to accommodate claim rather than a discrimination claim. However, plaintiff argues he was "forced . . . out of the workplace based on a phony fitness for duty evaluation" and proceeds under the indirect burden-shifting method for a disability disparate treatment claim. Accordingly, the court will analyze it as such.

articulated by plaintiff, he has failed to meet his burden because he cannot show that he was qualified for the essential function of driving at the time he was put on disability leave. Moreover, as described below, even assuming that Timmons has satisfied the prima facie case, he has not presented sufficient evidence to create a genuine issue of material fact that GM had a pretextual reason for placing Timmons on disability because GM believed he was not able to drive a car safely.

## II.    Timmons Fails to Satisfy the Prima Facie Case Under *Lawson*

GM does not assert that plaintiff is not disabled within the meaning of the Act.  GM argues, however, that plaintiff was not qualified to perform the essential functions of the job with or without reasonable accommodation.  "A determination as to whether a person is qualified for an employment position under the ADA involves a two-step inquiry: (1) the employee must possess the appropriate educational background, employment experience, skills, licenses, etc. and (2) he must also be able to perform the essential functions of the position held or desired, with or without reasonable accommodation." *Lawson,* 245 F.3d at 922.

The parties do not dispute that Timmons possessed the appropriate educational background, employment experience, and skills necessary to perform the job.  Timmons also does not dispute that driving is an essential function of the Customer Activities Manager.  He contends, rather, that he was able to drive and GM argues that he was not (with or without a reasonable accommodation).

According to GM, its in-house physician, Dr. Lacey, had determined that Timmons was unable to drive safely and that it is entitled to rely on Dr. Lacey's opinion.  *Mundt v. U.S. Postal Serv.*, No. 00 C 6177, 2001 WL 1313780, at *6 (N.D. Ill. Oct. 25, 2001) ("An employer is

entitled to rely on the medical determinations made by its own medical professionals so long as the reliance is reasonable and in good faith."). GM contends that it relied on Dr. Lacey's opinion in good faith and, in addition, that it was forced to do so because plaintiff refused to provide GM access to plaintiff's medical records.

Plaintiff, however, makes several arguments in response. First, relying on the testimony of Dr. Frank, his neurologist, plaintiff states that at the time he was placed on involuntary disability in June 2003, he was still capable of driving a GM-owned car safely. According to Timmons, he gave Dr. Frank authority to confer with GM in 2002 and 2003, and states that Frank spoke to GM medical personnel (specifically, Dr. Ting) and provided a "detailed report" to GM regarding his opinions. Timmons also states that the evidence shows that GM's medical department evaluated opinions "from Dr. Frank and Dr. Yang, another treating doctor, and advised Joyce Saunders, GM's regional human resources director, that it was safe for Timmons to drive."

Defendant, however, asserts that the "report" that Timmons refers to is an October 4, 2002 letter that Timmons purportedly sent to Dr. Ting at GM, but which Dr. Ting states she never received. Further, GM contends that there is no evidence that the letter was actually sent. GM also points out that even if GM had received the letter, it addressed Timmon's ability to drive in October 2002, not in June 2003 when Dr. Lacey (GM's doctor) examined Timmons and determined that he was unable to drive safely. GM argues that during 2003, "several events had occurred that precipitated GM's decision to re-evaluate plaintiff's driving ability": personal observations by Timmons' boss, Swinson, that Timmons was having trouble driving; Timmons request that his assistant, Kinney, drive him to an out-of-state meeting because he did not feel

comfortable making the drive, reports that had been made to Swinson and Tyler that Timmons had been driving slowly, and the fact that Timmons crashed his motorized scooter in the GM parking lot several months before the examination. According to GM, all of this evidence led it to ask Timmons if it could speak to his doctors about the issue but that Timmons forbade GM from talking to Dr. Frank or any of his personal physicians (after initially giving approval for such conversations). GM asserts it had no choice but to refer Timmons to its in-house doctor, Dr. Lacey for an examination to determine if Timmons could drive safely.

This court concludes that Timmons has failed to show that he was qualified for the position of CAM. Although Timmons states that he gave authorization in 2002 and 2003 for GM to confer with his doctors, Timmons admits that on June 2, 2003, he wrote a letter to Dr. Frank stating that he did "not wish for the company to have access to my private medical records."[11] Further, while the evidence indicates that both of Timmons' treating physicians spoke with GM's medical personnel, these conversations did not take place on or even around June 2003, when the decision was made to put Timmons on disability. Indeed, the portions of the record cited by Timmons (Saunders Dep. at 30-31, Ting Dep. at 22-24, 27-29) in support of his contention that GM was aware that Frank concluded that Timmons could drive all indicate conversations in 2002, not 2003.[12]

Thus, while plaintiff asserts he was able to drive safely at the time GM put him on

---

[11]The record indicates that while Timmons wrote to Dr. Frank on June 2, 2003, he notified GM of his withdrawal of authorization to have his medical records sent to Dr. Gerrick, GM's regional director, who replaced Dr. Ting. (Saunders dep. at 29).

[12]While Timmons also cites to plaintiff's Exh M, (May 8, 2003 letter authorizing Dr. Frank to discuss medical information) in support of his contention that he gave GM access to his medical information, plaintiff sent Dr. Frank a June 2, 2003, letter rescinding this approval.

disability, plaintiff has failed to show that *at that time*, *June 2003*, his doctors had stated to GM

that it was safe for him to drive.  Timmons points to a December 2004 statement by Dr. Frank

that Timmons could drive (with or without reasonable accommodation) in June 2003.  However,

Timmons has failed to put forth any evidence that GM had access to or was aware of Frank's

opinion at the time it put him on disability.  Timmons cannot withhold such opinions from GM at

the time it needed to make a determination on Timmons' ability to drive and then use this

statement to create a genuine issue of material fact.

Timmons attempts to undermine GM's reliance on the determination of its own doctor

because: (1) Dr. Lacey was not an expert on MS; (2) Dr. Lacey did not send Timmons for an

independent driving evaluation or have Timmons' driving evaluated; (3) the examination of

Timmons was not in accordance with any GM policy because GM had no policy regarding

disabled employees and their ability to drive; (4) Timmons' supervisor privately conferred with

Dr. Lacey both before and after the exam, for which only one day's notice was provided; and (5)

Timmons testified that Dr. Lacey's examination was short, not thorough and humiliating and Dr.

Lacey did not perform a motor strength evaluation.  The court concludes that none of these issues

creates a genuine issue of material fact as to the reasonableness of GM's reliance on Dr. Lacey's

conclusions.

Finally, Timmons refers to "guidance" opinions by the Equal Employment Opportunity

Commission that: (1) "an employer should be cautious about relying solely on the opinions of its

own healthcare professional that an employee poses a direct threat where that opinion is

contradicted by documentation from the employee's own treating physician. . . ."  However, as

discussed above, Timmons expressly withheld consent for GM to talk with his doctors at the

time Dr. Lacey conducted his examination and determined that Timmons was unable to drive a GM-owned vehicle. Timmons also refers to a second EEOC opinion that an employer is entitled only to information necessary to determine whether the employee can do the essential functions of the job or work without posing a direct threat. It is unclear to the court how this opinion is relevant in the instant case, and indeed, without any explanation from plaintiff, the court finds it irrelevant and certainly not sufficient to create a genuine issue of material fact regarding Dr. Lacey's finding.

In sum, GM was entitled to rely on Dr. Lacey's medical conclusions absent evidence to the contrary, and Timmons has not demonstrated that he was able to perform the essential function of driving a GM-owned vehicle with or without a reasonable accommodation in June 2003.

C.     <u>Timmons Fails to Create a Genuine Issue of Material Fact That GM's Reason for Putting Him on Disability Was Pretextual</u>

Finally, even if the court were to assume that Timmons has met his prima facie case, Timmons has failed to point to evidence creating a genuine issue of material fact as to whether the reason GM put him on disability leave (i.e., that he was not able to drive safely) was pretextual. Pretext requires more than a showing that the decision was "mistaken, ill considered or foolish." *Jones v. Union Pac. R.R.*, 302 F.3d 735, 743 (7th Cir. 2002) (*quoting Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000)). "[S]o long as [the employer] honestly believes [its proffered] reasons, pretext has not been shown." *Jordan*, 205 F.3d at 343. Furthermore, federal courts do not sit as a "super-personnel department that reexamines an entity's business decision and reviews the propriety of the decision." *Nawrot v. CPC Int'l*, 277 F.3d 896, 906 (7th Cir. 2002) (*citing Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000); *Dale v. Chicago Tribune*

*Co.*, 797 F.2d 458, 464 (7th Cir. 1986)). In order to establish pretext, therefore, a plaintiff must show that the employer's proffered explanation is factually baseless, not the actual motivation for the decision, or insufficient to support the decision. *Dyrek v. Garvey*, 334 F.3d 590, 598 (7th Cir. 2003). Ultimately the question is not whether the employer's decision was correct, but rather whether the employer's explanations for its decision are honest. *Dvorak v. Mostardi Platt Assocs.*, 289 F.3d 479, 487 (7th Cir. 2002).

The whole of plaintiff's argument regarding pretext is based on GM's failure to have his driving evaluated by a third-party evaluation service and "Dr. Frank's written opinions." However, without evidence that a third-party testing service deemed Timmons capable of driving safely at the time he was put on disability, simply referring to GM's failure to have Timmons tested in this manner is insufficient to create a genuine issue of material fact as to GM's basis for its decision. Moreover, as discussed above, even assuming Dr. Frank's written determination in 2002 that Timmons was capable of driving was communicated to GM, is not sufficient to rebut GM's decision to put him on disability in June 2003.

Timmons also refers to GM's lack of an internal policy it could claim it was following and that "defendant conceded that it could not have complied with EEOC guidelines [regarding when an employer can request a medical examination of an employee] because it had no idea what those guidelines entailed." Again, however, Timmons points to no evidence sufficient to create a genuine issue of material fact that these alleged deficiencies provide the basis for pretext.

Finally, Timmons contends that because Swinson admitted that Timmons attended a GM meeting in Phoenix in May 2003 and "did not have any problems driving there, attending the meeting, or participating," GM's reason for putting Timmons on disability leave was pretextual.

The court notes that Swinson's deposition testimony to which Timmons refers does not indicate that Timmons drove to Arizona. Swinson simply testified that he did not know of any problems that Timmons had in "getting to and from the meeting in Phoenix" or with respect to "attending and participating in" the meeting in Phoenix. This testimony does not create a genuine issue of material fact as to whether the reason GM gave for putting Timmons on disability was pretextual.

Because Timmons has failed to show that GM's proffered legitimate, non-discriminatory reasons for putting him on disability leave was false or dishonest, summary judgment in favor of GM is appropriate.

## IV.    CONCLUSION

For the foregoing reasons, the court grants defendant's motion for summary judgment [29-1]. The clerk is directed to enter a Rule 58 judgment and terminate this case from the court's docket.

**ENTER:**

*Blanche M. Manning*
_____
**Blanche M. Manning**
**United States District Court Judge**

**DATE:** July 22, 2005

24